IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE

In re

| | |
|---|---|
| LESTER DAN PIERCY, JR. | Case No. 3:18-bk-32261-SHB |
| DOLORES J. PIERCY | Case No. 3:18-bk-32260-SHB |
| JOSEPH SHANE PIERCY | Case No. 3:18-bk-32262-SHB |

      Debtors

M. DUSTIN LONG

      Plaintiff

v.

LESTER DAN PIERCY, JR., et al.

      Defendants

CONSOLIDATED CASES
**Adv. Proc. No. 3:18-ap-3043-SHB**
Adv. Proc. No. 3:18-ap-3044-SHB
Adv. Proc. No. 3:18-ap-3046-SHB

## M E M O R A N D U M

APPEARANCES:   SWANSON & COWAN, LLP
   Mark A. Cowan, Esq.
   717 West Main Street
   Suite 100
   Morristown, Tennessee  37814-4523
   Attorneys for Plaintiff

   QUIST, FITZPATRICK & JARRARD
   Ryan E. Jarrard, Esq.
   2121 First Tennessee Plaza
   800 South Gay Street
   Knoxville, Tennessee  37929
   Attorneys for Defendants

**SUZANNE H. BAUKNIGHT**
**UNITED STATES BANKRUPTCY JUDGE**

Plaintiff filed a Complaint in each of the foregoing adversary proceedings[1] on October 22, 2018 [Doc. 1], asking the Court to determine that a state-court judgment in the amount of $151,670.87 entered against Defendants jointly and severally is nondischargeable pursuant to 11 U.S.C. § 523(a)(4). On August 20, 2019, the Court entered a Judgment in favor of Defendants [Docs. 21, 22] that was timely appealed by Plaintiff [Doc. 25]. After the Judgment was affirmed by the United States District Court for the Eastern District of Tennessee [Doc. 35], Plaintiff timely appealed to the Sixth Circuit Court of Appeals [Doc. 36]. On December 29, 2021, the Sixth Circuit reversed the Judgment and remanded to the bankruptcy court, stating that "Long's state-court judgment may . . . be declared nondischargeable as a debt for fraud or defalcation while the Piercys were acting in a fiduciary capacity under § 523(a)(4), *provided that Long can produce evidence of their wrongful intent.*" *Long v. Piercy (In re Piercy)*, 21 F.4th 909, 928 (6th Cir. 2021) (emphasis added). After remand, the Court scheduled a trial, which was held on November 14, 2022.

The trial record consists of the Joint Pretrial Statement filed on November 4, 2022 [Doc. 49], eleven exhibits [Doc. 50-1] stipulated for admission or otherwise admitted into evidence or part of the trial record,[2] and the testimony of M. Dustin Long ("Long"); Lester Dan Piercy, Jr. ("Dan"); Delores J. Piercy ("Delores"); and Joseph Shane Piercy ("Shane"). The parties

---

[1] The Court entered an Order on February 19, 2019 [Doc. 9], that consolidated the adversary proceedings pursuant to Federal Rule of Civil Procedure 42 (made applicable in adversary proceedings by Rule 7042 of the Federal Rules of Bankruptcy Procedure) and designated Adv. Proc. No. 3:18-ap-3043-SHB as the lead case. Accordingly, all docket references in this Memorandum are in the lead adversary proceeding.

[2] At the outset of trial, Plaintiff opposed admission of Exhibits 3 and 5. Plaintiff's counsel, however, used Exhibit 3 during the direct examination of Long so that when Defendants asked to admit Exhibit 3 during Long's cross-examination, the Court overruled Long's relevance objection. Notwithstanding his objection at the beginning of trial, Plaintiff's counsel also used Exhibit 5 during his redirect examination of Dan. Thus, although neither party offered Exhibit 5 into evidence, Plaintiff's use of Exhibit 5 waives his objection to its admission and makes it part of the trial record such that the Court may consider Exhibit 5 in this decision. [*See* Pretrial Order [Doc. 47] at ¶ 2.D. ("All such exhibits will be deemed admissible at trial by any party subject only to objections grounded solely under Federal Rule of Evidence 402 or 403 unless objections to admissibility are filed at least seven days prior to trial.").] In any event, Exhibit 5 is corroborative of the trial testimony of Dan and Delores.

stipulated that proper venue lies with this Court and that the matters to be decided are core; that Long obtained a state-court judgment against the Piercys for $151,670.87; and that "the 'findings of fact & conclusions of law' that accompanies the [state-court] judgment is [*sic*] the [state] trial court's findings for the referenced judgment." [Doc. 49 at 2.] At the Court's direction, the parties filed pretrial and post-trial briefs [Docs. 52, 54, 56, 57.]

In the Joint Pretrial Statement, the parties identified the sole issue before the Court as: "Pursuant to the Sixth Circuit Court of Appeals ruling on December 29, 2021, did the Defendants act with the requisite wrongful intent required under 11 U.S.C. § 523(a)(4) with respect to Mr. Long[?]" [Doc. 49 at 1.] Because the Joint Pretrial Statement failed to expressly identify both embezzlement and defalcation as the remaining theories under § 523(a)(4) and Long's pretrial brief included only a passing reference to embezzlement, the Court clarified at the outset of the trial that Long intended to prove both embezzlement and defalcation as a "belt and suspenders" approach to the § 523(a)(4) claim.

## I. FINDINGS OF FACT[3]

Long's claim against the Piercys arises from a partners' dispute for the partnership created by the Contract executed by Long and the Piercys on April 27, 2011. The Contract provides (in total):

> This agreement is made this 27th day of April, 2011, between **GOINS HOLLOW QUARRY, LLC.**, having its principal place of business at 4586 Highway 25E, Tazewell, TN 37879, and **LONG EXCAVATING AND HAULING**, having its principal place of business at 120 Raymond Layel Road, Bean Station, TN 37708.
>
> This agreement provides compensation from the sale of DGA and shot rock[4] which will be crushed and screened from the location of Grainger/Claiborne line

---

[3] This Memorandum constitutes the Court's findings of fact and conclusions of law as required by Rule 7052 of the Federal Rules of Bankruptcy Procedure (incorporating therein Federal Rule of Civil Procedure 52).

[4] DGA stands for dense grade aggregate, and "shot rock" refers to everything else, from "boulders to dust."

> along Highway 25E. This material is being purchased for $2.67 per ton from Hinkle Contracting Company, LLC, by Assignment and Assumption and Transfer Agreement [("Assignment Agreement")[5]], which agreement has been signed by the parties, Dustin Long and Dan Piercy, Jr.
>
> The following percentages will apply to the profit from the sale of aforesaid DGA and shot rock:
>
> > Twenty-five percent (25%) for Dustin Long
> > Twenty-five percent (25%) for Dolores Piercy
> > Twenty-five percent (25%) for Shane Piercy
> > Twenty-five percent (25%) for Dan Piercy, Jr.
>
> All parties agree to these percentages for the profit made from the sale of these products[.]

[Tr. Ex. 1 (Doc. 50-1 at 16).] Notwithstanding that the Contract stated that it was between GHQ and Long Excavating and Hauling ("LEH"), the state court ruled that the Contract was between Long and the Piercys, individually, because payment was to the individuals, all of whom signed the Contract. [Tr. Ex. 2 at 3.]

Long testified that he had been buying rock from the Piercys at a site that they called Goins Hollow #1 and that he had been in the rock hauling business for approximately 16 years. Long talked with Dan about how the Piercys were getting rock into their area on "the other side of the mountain." They talked over a few weeks or months, and Dan proposed to work together so that Long would not need to purchase rock crushing and screening equipment and the Piercys could keep expenses down. Hinkle had a stockpile of rock on leased property, and the parties agreed with Hinkle to purchase the "processed and unprocessed shot rock and dense graded aggregate rock" located on the Hinkle's leased property, which was known as Goins Hollow #2.

The Piercys provided the equipment for processing the rock, and Long operated the scale house where the rock to be sold was weighed before it left the quarry. As trucks came onsite,

---

[5] The Assignment Agreement between Hinkle Contracting Company, LLC ("Hinkle"), Long, and Goins Hollow Quarry, LLC ("GHQ") (of which Defendants are members) is also part of Tr. Ex. 1 [Doc. 50-1 at 10-15].

they were weighed. Then after the rock was loaded onto the trucks, they were weighed again as they left the site to determine the volume or weight of the material being removed so that the sales price could be calculated. Long was charged with scheduling trucks and preparing and turning in at Goins Hollow #2 sales tickets on GHQ numbered forms for the amount of rock that was removed after it was weighed on the scale at Goins Hollow #2. The Piercys would then invoice the customer for the rock according to the tickets reflecting the scale-house weight of the rock. Neither Long nor LEH owned rock, but Long had a right to sell rock from Goins Hollow #2 by virtue of the Assignment Agreement. Long testified that his compensation for running the scale house at Goins Hollow #2 was the right to haul rock from the quarry.

The partnership started operating to sell rock on July 5, 2011. Long testified that he received two payments from the Piercys for his partnership work, one for July and one for August, but that both payments were short of what he had expected to be paid. Dan testified that the Piercys would pay invoices to Long at least 30 days from the date of the sale. He explained that they invoiced customer purchases monthly (e.g., from July 1 to the last day of July), with the payment to Long being tied to the date that the customer paid the invoice for the rock, which could be 45 to 60 days (or more) from the date of the sale. When asked why Long was not paid for September 2011 rock sales, Dan explained that everything was pushed out on a timeline for collection because they could not pay a dividend to Long unless they had the money from the sales. Delores also testified that they had to wait on customers to pay on their accounts, which was always at least 30 days from the sale of the rock from Goins Hollow #2.

Ultimately, the parties disputed how "profit" was to be determined under the Contract. Dan explained that the Piercys had interpreted profit to mean the sales proceeds net of the payment to Hinkle under the Assignment Agreement (i.e., $2.67 per ton) and all other expenses of the operation (which the Piercys thought meant a further reduction of $5.00 per ton). He said

that their interpretation arose out of the fact that they were providing everything to operate Goins Hollow #2 and that they had to borrow $165,000.00 to provide additional equipment that Long initially said he would provide, including a loader and a scale house. Although the Contract did not so provide, Dan testified that Long and the Piercys discussed in advance that profit would be calculated by reducing the Hinkle payment and $5.00 per ton for processing costs from gross sales, with the net to be split four ways.

Long testified that after he raised concerns with the Piercys about the July and August payments, they did not pay him anything for September or October, so he decided he needed to sell rock from Goins Hollow #2 to get his share of the partnership profits. At some point around early October 2011, Long got married and went on a honeymoon, during which he decided that when he returned, he was going to be more aggressive about questioning why he had not been paid. Long testified that at that time, in October, he was awaiting a payment for September and still had not cleared up the issue with the payments for July and August.

Then, as Dan and Delores testified (without refutation), while Long was on his honeymoon, the Piercys were contacted by Mark Cade.[6] Trial Exhibit 5 corroborates their testimony, establishing that on October 3, 2011, Cade emailed Dan to inquire about the haul price for an October 1 purchase from Long. [Tr. Ex. 5.] Cade sent Dan two tickets dated October 1, 2011, written on LEH forms and two tickets dated October 1, 2011, written on GHQ forms. [Tr. Exs. 3, 5.] Cade complained that the tickets reflected a price of $5.24 to $6.59 per ton but Long had quoted Cade a price of $3.70 per ton. [Tr. Ex. 5.] On October 5, Cade again emailed Dan, saying that Long had called Cade and they had resolved the haul charges to Cade's satisfaction. [Tr. Ex. 5.]

---

[6] Delores testified that she received a call from Cade and that after she spoke with Dan, she asked Cade for copies of the tickets, resulting in Cade's October 3, 2011 email with the tickets. [Tr. Ex. 5.]

Dan had never seen a ticket with LEH on it, and Long had not turned in the two October 1 tickets on LEH forms. Dan explained that GHQ accounted to Hinkle under the Assignment Agreement by providing him with a copy of all the GHQ tickets, which were sequentially numbered.[7] The LEH tickets were unnumbered and, thus, not traceable. Concerned about GHQ's and the Piercys' relationship with Hinkle, Dan contacted Hinkle after learning of the October 1 sales for which Long had not turned in tickets. Dan testified that the Piercys decided to lock Long from the property after consultation with Hinkle.

Thus, the dispute over Long's dissatisfaction with the short and delayed payments, coupled with the Piercys' concern about the October 1 LEH tickets, erupted when the Piercys padlocked Long from Goins Hollow #2 in late October. Although no one testified as to the exact date that Long was locked from the property, Dan testified that it was towards the end of October 2011. Dan's recollection is corroborated by an October 31, 2011 email from Delores to Hinkle. [Tr. Ex. 5.] In the email, Delores provided Hinkle with the two October 1 tickets on LEH forms that the Piercys had discovered only because of Cade's inquiry to Dan. [*Id.*] Delores noted to Hinkle that Long was "supposed to be back today or tomorrow and Dan will give him the letter from our attorney[8] at that time." [*Id.*]

Dan testified that although Long had a right under the Assignment Agreement to access the quarry property, the Piercys considered Long in breach of both the Assignment Agreement and the Contract when they discovered that Long had sold rock under the name of LEH without turning in the tickets. Both Delores and Shane testified similarly – that Long was locked from the property because of the discovery that the October 1 LEH tickets had not been turned in.

---

[7] Dan also testified that accounting for rock by tickets was the industry standard as of 2011.

[8] The record does not contain the referenced letter, but the Court gleans from the entirety of the testimony that the letter notified Long that he should not return to Goins Hollow #2.

Long returned to Goins Hollow #2 on or about November 17, 2011, with a sheriff's deputy, and he took rock that was weighed offsite. Although the Piercys resisted Long's entry on the property, the deputy informed them that they could not stop Long from entering and loading rock. The Piercys eventually paid Hinkle for the rock that Long took from Goins Hollow #2 to sell in the name of LEH, as reflected in the October 1, 2011 receipts. Dan explained to Hinkle that although Long had removed additional rock on November 17 under observation of the sheriff's deputy, Dan did not know how much rock Long had removed because it was weighed offsite.

As for failing to pay Long for September, Dan testified that they asked Long to come in to meet concerning the calculation of "profit" and scheduled a meeting by agreement, but Long failed to show. Moreover, by the time that the customer payments for the September invoices had been collected by the Piercys, they had learned about the October 1 LEH tickets, so they froze everything. That is, Dan explained that after they discovered that Long was "taking materials improperly," they did not pay Long because they were investigating whether Long also had removed rock during September. Given that Long had not turned in the October 1 LEH tickets for sales to Cade, as discovered by October 3, 2011, the Piercys were concerned that Long had created liability to Hinkle under the Assignment Agreement.[9] Delores also testified that they were unable to determine how much rock that Long had "misappropriated."

Although Long initially testified that he had not sold rock that was removed from Goins Hollow #2 to another individual outside of the partnership arrangement, he later conceded that he "sold rock to everybody." Long likewise was impeached by his August 20, 2012 deposition testimony from the state-court litigation in which he stated that the reason he had sold rock to

---

[9] Indeed, Hinkle later sued the Piercys and Long for breach of the Assignment Agreement, in part, for "failure to weigh the Rock on the Property" pursuant to the Agreement. [Tr. Ex. 10 at ¶ 18.]

another individual was because he had not been paid his 25%.  Also, at one point during cross-examination in this case, Long denied remembering whether he had stockpiled rock from Goins Hollow #2 at family property in Mooresburg, but he had testified at his 2012 deposition that it was "common practice" to stockpile material.[10]

On redirect, Long testified that there was no stipulation or restriction in the Contract to prohibit LEH from buying rock from Goins Hollow #2 at normal prices.[11]  Indeed, Delores testified that anyone could buy rock from Goins Hollow #2 and there was nothing wrong with Long taking rock from Goins Hollow #2 so long as it was accounted for but that the October 1 LEH tickets had created serious concerns among the Piercys about Long removing rock without accounting for it.

## II.  LAW AND ANALYSIS

The underlying state-court judgment makes clear that the state court disagreed with the Piercys' interpretation of the Contract.  That finding, however, is not relevant to the issue remaining in this case – the intent of the Piercys in their decisions to lock Long off the property and to not pay Long timely for his share of the profits, however calculated.  Long argues that under Tennessee law, the first party to breach may not complain against the other party to the contract.  He then argues that the chancery court found that the first material breach was the Piercys' failure to pay Long his proper percentage of profit.  Although Long is correct, the issue

---

[10] Long also had attempted to negotiate a sale of Goins Hollow #2 rock from LEH (instead of from the partnership under the name of GHQ) to the Grainger County road superintendent.  When asked about this attempted side deal, Long testified that he would have paid GHQ for the rock he used but that he had not discussed the side deal with the Piercys because "[LEH] had nothing to do with the Piercys' business."  Long explained that the Contract did not preclude either of the parties from buying rock.  Long acknowledged that the state-court judgment included an agreed offset for the Piercys' counterclaim for rock that LEH took from Goins Hollow #2.  The record does not contain any information about when the Piercys learned that Long had attempted to negotiate a side deal with Grainger County.  Without that information, which might further impact the Court's determination of the Piercys' intent, the attempted side deal is irrelevant.

[11] Notably, however, when Long's counsel asked him at trial whether he had taken any rock from Goins Hollow #2 before October 1, 2011, other than hauling for his customers, after what seemed to the Court to be an inordinately long delay in answering, Long testified that he had not taken any rock before October 1.

is not who breached first and whether Long was in breach when he sold rock using his unnumbered LEH tickets on October 1. The issue here is whether Long has carried his burden to "produce evidence of [the Piercys'] wrongful intent." *In re Piercy*, 21 F.4th at 928.

To that point, Long argues that when a fiduciary intentionally breaches a known duty, the fiduciary has "per se" committed defalcation, relying on dictum in *Financial Casualty & Surety Co. Inc. v. Thayer*, 559 B.R. 102, 120 n.19 (D.N.J. 2016). [Doc. 54 at 3-4.] The Court, however, disagrees with Long on this point. While "[t]he element of defalcation requires proof that the defendant breached a fiduciary duty . . . , not every such breach amounts to defalcation." *Andrade v. Hill (In re Hill)*, 610 B.R. 154, 161 (Bankr. D. Me. 2019). Indeed, the Sixth Circuit, which found that the Piercys had breached their fiduciary duty under Tennessee law, remanded this case for trial so that Long would have the opportunity to "produce evidence of [the Piercys'] wrongful intent." *In re Piercy*, 21 F.4th at 928.

Courts construe § 523(a) actions liberally in favor of debtors and strictly against creditors, who bear the burden of proving the necessary elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998). Nondischargeability under § 523(a)(4) requires a showing that the debt was incurred by embezzlement, larceny, or fraud or defalcation while acting in a fiduciary capacity. Embezzlement is the intentionally fraudulent misappropriation of property otherwise lawfully held by the wrongdoer. *See In re Piercy*, 21 F.4th at 919 (stating the proof required for embezzlement). Defalcation while acting in a fiduciary capacity provides a basis for a determination of nondischargeability only if the plaintiff proves "(1) a pre-existing fiduciary relationship; (2) breach of that relationship; and (3) resulting loss." *Patel v. Shamrock Floorcovering Servs., Inc. (In re Patel)*, 565 F.3d 963, 968 (6th Cir. 2009). Defalcation, "which may be used to refer to *nonfraudulent* breaches of fiduciary duty,"

"includes a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase[:] . . . one involving *knowledge of*, or *gross recklessness* in respect to, the *improper nature* of the relevant fiduciary behavior." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269, 275 (2013) (emphases added); *see also Weiss v. Fautz (In re Fautz)*, 636 B.R. 553, 571 (Bankr. D. Mass. 2022) ("The meaning of defalcation has at its core the misappropriation of money held in a fiduciary capacity and the failure to account for any such monies. . . . *Provided there exists the necessary level or type of intent, risk, or scienter . . .* , defalcation encompasses any breach of fiduciary duty that results in a monetary deficiency." (citations omitted) (emphasis added)).

Again, the Sixth Circuit made clear that for Long to prove his claim for embezzlement or defalcation under § 523(a)(4), he need only prove the requisite wrongful intent, whether fraudulent intent as required for embezzlement or at least gross recklessness for defalcation. *In re Piercy*, 21 F.4th at 919 (citing *Bullock*, 569 U.S. at 269, 275) (stating that although "embezzlement . . . requires demonstrating a debtor's fraudulent intent, . . . defalcation . . . requires only a showing of gross recklessness"). Based on the evidenced presented at trial, applying the burden of proof to Long (as the Court must) and construing the provisions of § 523(a)(4) strictly against Long (also as the Court must), the Court finds that Long has failed to carry his burden to prove that any of the Piercys possessed the requisite fraudulent intent for embezzlement or the requisite showing of at least gross recklessness to establish defalcation.

Notably, the Sixth Circuit has long held that fraudulent intent is determined under a subjective standard. *See In re Rembert*, 141 F.3d at 281. Absent direct evidence of fraudulent intent, the court must determine whether fraudulent intent may be "inferred as a matter of fact" based on a totality of the circumstances when a defendant has engaged in "blameworthy" conduct. *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 759 (Bankr. E.D. Tenn. 2003). "It

is well-settled that issues concerning credibility and intent are questions of fact that must be resolved by observing a witness's demeanor and presence on the stand" and a "determination of nondischargeability often comes down to which witnesses are most credible and a debtor's conduct prior to, at the time of, and subsequent to the representations at issue." *Kloeber v. Montanari (In re Montanari)*, No. 12-33189, 2015 WL 603874, at *8 (Bankr. E.D. Tenn. Feb. 12, 2015) (quoting *Hall v. Carter (In re Carter)*, No. 13–3094, 2014 WL 4187123, at *4 (Bankr. E.D. Tenn. Aug. 21, 2014) (citations omitted)); *see also Estate of Cora v. Jahrling (In re Jahrling)*, 816 F.3d 921, 926 (7th Cir. 2016) (finding that the bankruptcy court did not err when it based its findings about the debtor's state of mind on circumstantial evidence and drew inferences "based on the objective circumstances, but . . . applied the correct subjective standard"); *Nev. Prop. 1 LLC v. D'Amico (In re D'Amico )*, 509 B.R. 550, 557 (S.D. Tex. 2014) ("The debtor's subjective motive to cause harm, however, is a question of fact[.]"); *Ross v. Cecil Cnty. Dep't of Social Servs.,* 878 F. Supp. 2d 606, 621 n.26 (D. Md. 2012) ("Resolution of questions of intent often depends upon the credibility of the witnesses, which can best be determined by the trier of facts after observation of the demeanor of the witnesses during direct and cross examination." (citation omitted)).

"[T]he scienter required for the three offenses described in § 523(a)(4) – fiduciary fraud and defalcation, embezzlement, and larceny – are 'akin,' or closely related, to each other." *Peltier v. Van Loo Fiduciary Servs., LLC (In re Peltier)*, 643 B.R. 349, 360 (B.A.P. 9th Cir. 2022). Nonetheless, as noted by the Sixth Circuit in this case, "defalcation under the first prong requires only a showing of gross recklessness." *In re Piercy*, 21 F.4th at 919 (citing *Bullock*, 569 U.S. at 269, 275). In applying the subjective intent standard to defalcation under § 523(a)(4), the Supreme Court explained:

> [W]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as

> intentional not only conduct that the fiduciary knows is improper but also *reckless conduct of the kind that the criminal law often treats as the equivalent*. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent *if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty*. ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985). *See id.,* § 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include "'wilful blindness'"). That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id.,* § 2.02(2)(c), at 226 (emphasis added). *Cf. Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194, n.12 (1976) (defining scienter for securities law purposes as "a mental state embracing intent to deceive, manipulate, or defraud").

*Bullock*, 569 U.S. at 273-74 (emphases added); *see also Newman v. Lee (In re Newman)*, BAP No. CC-21-1228-GTL, BAP No. CC-21-1250-GTL (Cross-Appeals), 2022 WL 2100905, at *5 (B.A.P. 9th Cir. June 10, 2022) ("To establish defalcation, a movant must show: (1) bad faith, moral turpitude, or other immoral conduct; or (2) an intentional wrong." (citing *Bullock*, 569 B.R. at 273-74)); *McFeely Ltd. P'ship v. Dilworth (In re Dilworth)*, No. 18-31552 (AMN), Adv. No. 18-03034 (AMN), 2022 WL 987044, at *22-23 (Bankr. D. Conn. Mar. 31, 2022) (finding that the evidence presented did not support a finding that the debtor engaged "in a fraudulent scheme to siphon money out of a trust, partnership, or business with the sole intent of personal gain, concealment of the withdrawals, and with conscious disregard to those who might be injured by their actions"); *In re Fautz*, 636 B.R. at 571 (explaining that "defalcation requires some degree of fault, closer to fraud, without the necessity of meeting a strict specific intent requirement . . . something closer to a showing of extreme recklessness." (quoting *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9, 18, 20 (1st Cir. 2002)); *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 68 (2d Cir. 2007) (stating that "defalcation under § 523(a)(4) requires a showing of conscious misbehavior or extreme recklessness – a showing akin to the showing required for scienter in the securities law context").

The *Piercy* decision is the only Sixth Circuit decision that cites *Bullock*. Other courts have read the gross-recklessness standard of *Bullock* to require a showing of at least a "subjective, criminal level of recklessness." *In re Jahrling*, 816 F.3d at 925, *cited in Andringa v. Acker (In re Acker)*, Case No. 19-21349-kmp, Adv. No. 19-2089, 2021 WL 1346575, at *10 (Bankr. E.D. Wis. Mar. 31, 2021); *Ga. Lottery Corp. v. Owens (In re Owens)*, 599 B.R. 388, 394 (Bankr. N.D. Ga. 2019); *Sonnentag v. Swinehart (In re Swinehart)*, Case No. 18-25585-kmp, Adv. No. 18-2198, 2019 WL 5204457, at *7 (Bankr. E.D. Wis. Oct. 15, 2019); *cf. Mulligan v. Jalbert (In re Mulligan)*, 763 F. App'x 70, 74 (2d Cir. 2019) (finding that the *Bullock* standard was met by a criminal finding of statutory theft, which necessarily included "the intent to deprive another of property"). As explained by one court:

> In *Bullock*, the Supreme Court resolved a split among the circuits as to the meaning of defalcation by holding that it requires proof of an "intentional wrong." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273 (2013). . . . .
>
> The *Bullock* standard for defalcation relies heavily on the criminal law definition for recklessness [and] . . . contrasts with the tort definitions the Supreme Court has applied to define terms in other subsections of § 523. *See Field v. Mans*, 516 U.S. 59, 69 (1995) (relying on the Restatement (Second) of Torts to define the term "actual fraud" found in § 523(a)(2)). In the case of recklessness, this distinction is important because the criminal and civil definitions of that term differ. *The test for criminal recklessness is subjective, while the tort definition is objective. Farmer v. Brennan*, 511 U.S. 825, 836–37 (1994). Under the civil definition, it is enough to show that the actor should have known of risk of harm his actions created. *Id*. . . . . *A jury's assessment of criminal recklessness is always made from the point of view of the actor's perceptions*, i.e., to what extent he was aware of risk, of factors relating to its substantiality and of factors relating to its unjustifiability.
>
> . . . .
>
> Indeed, the *Bullock* decision specifically overruled the "objective recklessness" standard that the lower court had applied and remanded for application of the new heightened standard. *Bullock*, 569 U.S. at 277.

*In re Cupit*, 514 B.R. 42, 49–51 (Bankr. D. Colo. 2014) (emphases added) (some quotation marks, footnote, and citations omitted).

Case 3:18-ap-03044-SHB    Doc 28    Filed 02/24/23    Entered 02/24/23 16:23:22    Desc
Main Document    Page 15 of 18

Moreover, "[a]ssuming there is either conscious disregard or willful blindness to a risk of violating a fiduciary duty, there must also be evidence that the risk disregarded was 'substantial' and 'unjustifiable' to establish a § 523(a)(4) claim." *Id.* at 52. "As one court put it, '[w]hether a risk is substantial must be determined by assessing both the likelihood that harm will occur and the magnitude of the harm should it occur. . . . [W]hether a risk is unjustifiable must be determined by assessing the nature and purpose of the actor's conduct relative to how substantial the risk is.'" *Id.* (quoting *People v. Hall,* 999 P.2d 207, 218 (Colo. 2000)); *compare Heers v. Parsons (In re Heers)*, 529 B.R. 734, 745 (B.A.P. 9th Cir. 2015) ("The records in these appeals reflect a pervasive and unjustified series of breaches of fiduciary duties by Debtor."); *Conn v. Roach (In re Roach)*, Case No. 21-13557-PDR, Adv. Case No. 21-01233-PDR, 2022 WL 3449214, at *3-4 (Bankr. S.D. Fla. Aug. 17, 2022) ("Without any subjective basis to believe she was actually owed money from the Land Trust, her justification for violating her duty under the Land Trust Agreement begins to wither. . . . The record is . . . devoid of any support for the Mother's subjective belief that her actions were appropriate."); *James River Petroleum, Inc. v. Dickson (In re Dickson)*, Case No. 19-70934-SCS, APN 19-07013-SCS, 2020 WL 6877150, at *25 (Bankr. E.D. Va. Sept. 29, 2020) ("James River has also proven that Dickson Convenience's conduct, through Mrs. Dickson, was not justifiable on any level in light of the nature and purpose of Mrs. Dickson's conduct as the same relates to the substantiality of the risk."); *Commercial Cash Flow, L.L.C. v. Matkins (In re Matkins)*, 605 B.R. 62, 107 (Bankr. E.D. Va. 2019) ("The Court cannot find that the conduct here was in any way justifiable."), *with In re Hill*, 610 B.R. at 162-63 (rejecting the defalcation claim, finding that the debtor's belief about the status of the partnership "was not unreasonable given the deterioration of the parties' business relationship" and the fact that "they did not even share a common understanding of the meaning of the term 'profits'"). Some courts have noted that looking to whether the debtor's conduct was

subjectively justifiable or willfully blind does not allow debtors to "play ostrich" to whether their actions are a breach of fiduciary duty. *See Stoughton Lumber Co., Inc. v. Sveum*, 787 F.3d 1174, 1177 (7th Cir. 2015); *JK Transports, Inc. v. McGill (In re McGill)*, 623 B.R. 876, 894 (Bankr. D. Colo. 2020); *Chavis v. Mangrum (In re Mangrum)*, 599 B.R. 868, 877 (Bankr. E.D. Va. 2019); *Aiello v. Aiello (In re Aiello)*, 533 B.R. 489, 503 (Bankr. W.D. Pa. 2015).

Applying these standards for embezzlement and defalcation under § 523(a)(4) to the facts presented at trial leads the Court to conclude that Long failed to meet his burden of proof concerning wrongful intent.[12] As a preliminary matter, Long's conflicting testimony recited above leads the Court to discount his credibility to the extent that it contradicts any evidence offered by the Piercys. At bottom, though, the issue the Court must reach is whether Long has proven that any of the Piercys had the requisite intent to constitute either embezzlement or defalcation while acting in a fiduciary capacity.

The first breach of the Piercys' fiduciary duty under Tennessee law concerning the handling of partnership profits, as required by Tennessee Code Annotated section 61-1-404, was their failure to pay Long his proper share of profits for the rock sales in July and August 2011. Although the state trial court determined that the Piercys' interpretation of "profits" under the Contract was legally incorrect, Long failed to produce evidence that any of the Piercys had fraudulent intent or that they subjectively acted with gross recklessness concerning the amount

---

[12] Dan, Shane, and Delores were challenged by Long at trial about whether they, along with other family members, had been compensated (or their personal expenses paid for by GHQ) when Long had not been paid properly under the Contract. Evidence was presented from the summary financial records of GHQ, which combined income and expenses for Goins Hollow #1 and Goins Hollow #2, as well as other jobs. The limited financial records of GHQ are irrelevant to the question of the Piercys' intent. This is especially true given that Long bears the burden of proof, and he failed to present detailed financial records that could have been obtained in discovery that would have shown income and expenses from July and August 2011, before the early October discovery of Long's possible misappropriation of rock from Goins Hollow #2 as evidenced by the two LEH tickets that were unnumbered and had not been turned in by Long.

paid to him for July and August.[13]  The Piercys and Long testified that their preliminary discussions included the topic of whose equipment would be used to crush and screen the rock. The Piercys also testified (without contradiction) that the parties ultimately decided that they would provide the equipment, resulting in the Piercys borrowing $165,000.00 to upgrade equipment for Goins Hollow #2, which led to the Piercys' belief that the term "profit" in the Contract meant net profit after deducting $2.67 per ton to be paid to Hinkle plus $5.00 per ton for equipment expenses at Goins Hollow #2.

Long presented no evidence of fraudulent intent to prove embezzlement relating to the Piercys' interpretation of "profit" for the payments for July and August 2011 sales.  Given the lack of evidence of "actual knowledge of wrongdoing," the Court considers whether the Piercys' conduct reflects a conscious disregard or willful blindness to "'a substantial and unjustifiable risk' that [their] conduct w[ould] turn out to violate a fiduciary duty." *Bullock*, 569 U.S. at 273 (quotation omitted).  Reviewing the evidence to determine the Piercys' state of mind and drawing inferences "based on the objective circumstances" while "appl[ying] the correct subjective standard," *In re Jahrling*, 816 F.3d at 926, the Court finds insufficient evidence of wrongful intent concerning the incorrect amounts of the July and August payments.  Dan testified that they paid Long for July and August before Long was padlocked from the property, even though they did not believe that the partnership's operations at Goins Hollow #2 had made a profit.  Dan also testified (without contradiction) that they had tried to hold a meeting with Long concerning their disagreement over the additional $5.00 per ton deduction before splitting profits, and Long failed to appear for the meeting that was mutually scheduled.

---

[13] The Piercys conceded that they drafted a poor agreement and that they were bad bookkeepers. They note accurately, however, that the burden on Long is to show at least gross recklessness on the claim that the Piercys committed defalcation while acting in a fiduciary capacity.

Concerning the failure to pay Long for September and October sales, the uncontroverted evidence about the expected timing of payments leads to the conclusion that by October 3, when the Piercys discovered that Long had sold rock from Goins Hollow #2 without accounting for it, Long was not yet due payment for September sales because of the lag from invoicing to customer payment before profits could be determined.  The failure to pay Long beyond the rock sold in August and the decision to lock him from the quarry property were not unreasonable under the totality of the circumstances.  Thus, the Court finds that the trial record does not establish that the Piercys possessed the requisite wrongful intent for either embezzlement or defalcation while acting in a fiduciary capacity.  As the bankruptcy court stated in *In re Hill*, 610 B.R. at 160, "[c]oming close to making th[e § 524(a)(4)] showing is not quite enough."

## II.  CONCLUSION

Based on the foregoing, Long did not meet his burden of showing that any of the Piercys' debt to him should be excepted from their respective Chapter 7 discharges.  A Judgment consistent with this Memorandum will be entered.

FILED:  February 24, 2023

BY THE COURT

*s/ Suzanne H. Bauknight*

SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE